DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JOHN GOODMAN,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D14-4479

[July 26, 2017]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Jeffrey J. Colbath, Judge; L.T. Case No. 502010CF005829 AMB.

Margaret Good-Earnest and Cherry Grant of Good-Earnest Law, P.A., Lake Worth, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Richard Valuntas, Assistant Attorney General, West Palm Beach, for appellee.

WARNER, J.

In his appeal of his conviction and sentence for DUI manslaughter with failure to render aid, and vehicular homicide with failure to render aid, appellant raises thirteen issues. We affirm as to all and write to address three issues. First, appellant contends that the State prematurely released his vehicle after his first trial, thus violating his due process rights and requiring dismissal under *California v. Trombetta*, 467 U.S. 479 (1984). We disagree, concluding that because of the prior testing on the vehicle and the State's agreement not to introduce certain testing by its expert, the vehicle was not "constitutionally material" and any potential prejudice was eliminated. Second, he contends that the jury instructions on the failure to render aid enhancements violated due process by failing to require that appellant knew that the accident resulted in injury or death. The statutes, however, merely require that the person "knew or should have known of the crash," not the injury. The instructions read to the jury went beyond this and required that appellant "knew" of the crash. We therefore reject appellant's challenge to the jury instructions. Third, appellant claims that his blood was drawn without a warrant, violating the

Fourth Amendment Search and Seizure clause. However, the exigent circumstances exception applies, and the failure to obtain a warrant was not error. As to the sentence for the vehicular homicide conviction, which the court held in abeyance, we reverse on double jeopardy grounds.

Following a late-night two-vehicle accident, in which the other driver died after his vehicle was submerged in a canal, appellant was charged with DUI manslaughter with failure to render aid (Count 1) and vehicular homicide with failure to render aid (Count 2). Appellant was convicted and sentenced following his first trial. After juror misconduct came to light, *see DeMartin v. State*, 188 So. 3d 87 (Fla. 4th DCA 2016), appellant's first conviction was vacated and he was granted a new trial.

Prior to his second trial, appellant moved to dismiss the charges against him after he discovered that the State had prematurely released the two vehicles involved in the crash. One of the vehicles, a Bentley driven by appellant, was eventually found in Texas, having been repaired and refurbished. Appellant argued that the Bentley was materially exculpatory based on his allegation that an issue with the throttle led to a brake malfunction. He admitted that the malfunction had been extensively discussed during his first trial, including codes from the Bentley's electronic control module ("ECM") indicating a throttle malfunction. However, appellant argued that his automotive engineer expert was not allowed to conduct the same physical manipulative inspections of the Bentley's throttle as the State's expert. Following a hearing, the court denied the motion to dismiss, determining that "the Bentley did not rise to the level of materially exculpatory evidence and instead was only potentially useful evidence[.]" Therefore dismissal was "too harsh a sanction in the absence of bad faith on the part of the State." As the State agreed not to call its expert, "there remains no prejudice to Defendant in his ability to present the expert testimony and findings he has collected."

Appellant also sought to suppress the results of his blood alcohol test, arguing that the test constituted a warrantless search in violation of his Fourth Amendment rights. The court held a hearing, during which the testimony indicated that the crash occurred around 1:00 a.m., but appellant left the scene and called 911 about an hour later. He returned to the scene shortly after 2:00 a.m. At 2:26 a.m., he was transported to the hospital. At 2:31 a.m., the victim's body was discovered. The homicide investigator was called and arrived at the crash site at 3:18 a.m. At 3:33 a.m., the investigator met appellant at the hospital, where he observed signs of intoxication. After appellant refused a voluntary blood draw, a forced blood draw was conducted at 4:00 a.m. The investigator testified that it would have taken two-and-a-half hours that night to obtain a

warrant. On these facts, the court denied the motion to suppress the blood test results, finding that the exigent circumstances exception applied.

At the second trial, the evidence showed that appellant ran a stop sign without braking and "t-boned" the victim. Appellant was going sixty-three miles per hour in a thirty-five miles per hour zone. The force of the impact pushed the victim's Hyundai through the intersection and into a nearby canal, where it came to rest upside down. Appellant did not remain on the scene or assist the victim, who ultimately drowned. The victim did not sustain fatal injuries in the collision itself. Earlier in the evening, appellant had consumed alcohol at several venues, the amount of which was a contested issue at trial.

After the accident, appellant quickly left the scene on foot. He resurfaced a half hour later at a woman's trailer, seeking a phone. He used the woman's phone to call his girlfriend. The woman testified that appellant acted slow and "out of it." He was mumbling and repeating himself, and told her that he was in a really bad accident and hoped no one was hurt. He admitted he had a few drinks. After appellant spoke with his girlfriend, he asked the woman what to do. When she suggested he call 911, appellant asked whether he should call his lawyer first and turn himself in. Appellant never mentioned stopping elsewhere between the crash and arriving at her trailer.

Appellant called 911 at 1:56 a.m. He told the 911 operator that he stopped at a stop sign, looked, did not see anything, pulled out, and hit something. He did not say his car malfunctioned. He said he walked down the road to a barn, hopped over the gate, and came to the woman's house to get a phone.

A deputy picked up appellant to bring him back to the crash site. When the deputy asked appellant if he was injured, he only mentioned pain in his wrist. He claimed that he stopped at the stop sign, went through the stop sign, hit something, was unaware of what he hit, and left to make a phone call. Appellant was emanating the odor of alcohol and his speech was slurred. Upon returning to the crash site, the deputy escorted appellant to paramedics.

The paramedics who treated appellant at the scene also noted that his speech was a little slurred and he smelled of alcohol. He did not, however, appear to have consumed a large amount of alcohol within the hour prior. Appellant was not dizzy, his head did not hurt, and he denied losing consciousness. Once at the hospital, appellant was alert and did not

complain of head pain, dizziness, or nausea. The doctor's notes indicated that he denied losing consciousness.

Appellant refused a blood test, but had blood drawn at 3:59 a.m., which revealed that his blood alcohol level was 0.177 and 0.178. A toxicologist calculated that appellant's blood alcohol level at the time of the crash was between 0.207 and 0.237, the equivalent of twelve to thirteen drinks.

Appellant's forensic engineer testified that the Bentley did not stop at the stop sign. He opined that the vehicle was going between forty-nine and fifty-eight miles per hour at the time of the crash.

Appellant's automotive engineer testified that he had inspected the Bentley prior to the first trial, before it was released. The ECM report registered a fault code at some point prior to the crash. The code indicated that the vehicle's two throttle valves were unsynchronized due to a mechanical malfunction. One of the two throttles in the vehicle was lagging behind the other, but the expert was unable to determine whether the lag was in engaging or releasing the accelerator pedal, and he was unable to determine how long the lag was. Regardless, the throttle issue did not affect the braking system, and, due to the vehicle's multiple override systems, upon applying the brakes, "[i]n a worst case scenario, the driver might feel a delay in response[.]" The expert speculated that there could have been some computer malfunction as well, but he had no data reflecting such. He had been unable to conduct certain tests because of the vehicle's release and refurbishment. He admitted he had previously testified during a deposition that further testing would not tell him anything beyond what he already knew based on the vehicle's diagnostic stored data.

The State's electrical engineer also inspected the Bentley after it was found in Texas and opined that the braking system functioned until damaged in the crash. The State's vehicle expert from the first trial did not testify at the second trial.

Appellant testified in his defense and claimed that he was not intoxicated at the time of the accident, but rather that the brakes on his Bentley malfunctioned when he attempted to stop at the stop sign. He said that he lost consciousness in the crash. After he awoke, he looked around the crash site, which was very dark, but did not see any vehicles. He did not look in the canal. His phone wasn't working, so he decided to go look for a phone to call 911.

Significantly, appellant testified that after he left the crash site to find a phone, he came upon a "man cave" belonging to a member of the polo team he owned. The "man cave" did not have a telephone, but was stocked with liquor. Appellant testified that he drank an unknown quantity of alcohol from a bottle, then headed toward the woman's trailer. Appellant testified that he told one of the deputies that he went into the "man cave" and consumed alcohol after the crash.

Several motions and hearings were held prior to and during trial regarding the jury instructions for the failure to render aid enhancement on both charges. The standard jury instruction for the enhancement on the DUI manslaughter charge provides:

> If you find the defendant guilty of Driving under the Influence Manslaughter, you must further determine whether the State proved beyond a reasonable doubt that:
>
> 4. (Defendant), at the time of the crash,
>
> a. **knew or should have known that the crash occurred** and
>
> b. failed to give information as required by law and
>
> c. failed to render aid as required by law.

Fla. Std. Jury Instr. (Crim.) 7.8 (emphasis added). The corresponding instruction for the vehicular homicide charge provides:

> If you find the defendant guilty of [vehicular] [vessel] homicide, you must then determine whether the State has further proved beyond a reasonable doubt that:
>
> 1. At the time of the accident, (defendant) **knew, or should have known, that the accident occurred**; and
>
> 2. (Defendant) failed to give information and render aid as required by law. (Read applicable portion of § 316.062, Fla. Stat., as charged in information or indictment.)
>
> **However, the State is not required to prove (defendant) knew that the accident resulted in injury or death.**

Fla. Std. Jury Instr. (Crim.) 7.9 (emphasis added).

5

Appellant proposed adding a requirement that he "knew that the accident resulted in death or injury[,]" rather than mere knowledge of the accident. The State agreed to include an element regarding knowledge of injury or death, but argued for the lesser "knew or should have known" knowledge requirement. The court agreed with the State. With the State's agreement, the court deleted the last sentence of Instruction 7.9.

During trial, the parties and the court again reviewed the jury instructions, and appellant renewed his request to include actual knowledge of injury or death as an element of Instruction 7.8. The court declined to add a "knew of death" requirement, ruling that the standard should be "knew or should have known." As to knowledge of the accident, the court denied the State's requested inclusion of "should have known," instead requiring actual knowledge. The court granted appellant's request to include a definition of "willfully."

As to Instruction 7.9, appellant did not submit another proposed version. The State objected to deletion of the "should have known" of accident language. There was no specific discussion of the inclusion of a "knew of death" requirement in Instruction 7.9. The court granted appellant's request to include actual knowledge of accident. Notably, the court ruled that it would include the last sentence in Instruction 7.9 ("However, the State is not required to prove (defendant) knew that the accident resulted in injury or death"), contrary to its previous ruling.

After another conference, a final version of the instructions was submitted. This version of Instructions 7.8 and 7.9 included a willfulness requirement and required actual knowledge of the accident, but did not require any knowledge of injury or death. Instruction 7.9 included the sentence specifying that actual knowledge of injury or death was not required. Appellant stated that he had no new or additional objections to this version of the instructions.

Instruction 7.8, as read to the jury, provided as follows:

> If you find the defendant guilty of driving under the influence manslaughter, you must further determine whether the State proved beyond a reasonable doubt that John Goodman at the time of the crash A, **knew that the crash had occurred**. And B, willfully failed to give information as required by law. And C, willfully failed to render aid as required by law. Willfully means intentionally, knowingly, and purposely. Florida requires that a driver of any vehicle involved in a crash resulting in injury or death of any person or damage to any

6

vehicle or other property which is driven or attended by any person must supply his name, address, and the registration number of the vehicle he is driving, to any person injured in the crash or to the other driver or occupant or other person attending any vehicle or other property damaged in the crash
. . . .

(Emphasis added).  In Instruction 7.9, the court instructed as follows:

If you find the defendant guilty of vehicular homicide you must then determine whether the State has further proved beyond a reasonable doubt that 1, at the time of the accident John Goodman **knew that an accident occurred**. And two, John Goodman willfully failed to give information and render aid as required by law.  Willfully means intentionally, knowingly, and purposely.  **However the State is not required to prove that John Goodman knew that the accident resulted in injury or death**.

(Emphasis added).  Instruction 7.9 followed with the same explanation of the duty to render aid as was given in Instruction 7.8.

The jury found appellant guilty as charged.  Appellant was adjudicated guilty and sentenced to sixteen years in prison on Count 1 (DUI manslaughter with failure to render aid).  The court took no action on the jury verdict on Count 2 (vehicular homicide with failure to render aid). Although appellant objected and argued that Count 2 should be dismissed, the court agreed with the State's request to hold Count 2 in abeyance, so that if appellant prevailed on Count 1 on appeal, the court could still adjudicate and sentence him on Count 2.  From this conviction and sentence, appellant has brought this appeal.

## Release of the Bentley Was Not a Due Process Violation

In his first issue on appeal, appellant contends that his due process rights were violated when the State prematurely released the Bentley prior to the second trial, despite knowing that it was significant and material to his defense.  The State disagrees that the Bentley was constitutionally material.  We agree with the State and hold that the court did not err in denying the motion to dismiss due to the loss of the Bentley.  Whether a defendant's due process rights have been violated by the State's destruction of or failure to preserve evidence is a legal question and is therefore reviewed de novo. *Patterson v. State*, 199 So. 3d 253, 256 n.2 (Fla. 2016).

7

When dealing with potentially exculpatory or useful evidence that has been permanently lost, "courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *California v. Trombetta*, 467 U.S. 479, 486-87 (1984).

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 488-89 (footnote omitted) (citation omitted).

"Lost or unpreserved evidence is 'material' in this sense 'if the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *State v. Davis*, 14 So. 3d 1130, 1132 (Fla. 4th DCA 2009) (quoting *State v. Sobel*, 363 So. 2d 324, 327 (Fla. 1978)). "Where lost or unpreserved evidence is 'material exculpatory evidence,' the loss of such evidence . . . the good or bad faith of the State is irrelevant." *Id.* However, in cases where the destroyed evidence is merely potentially useful, as opposed to constitutionally material, failure to preserve the evidence does not constitute a due process violation unless there is a showing of bad faith on the part of the state. *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). In *Youngblood*, the court further explained the difference between the due process implications of the destruction of materially exculpatory evidence and that which is only potentially useful:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the **Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant**. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta, supra*, 467 U.S., at 486, 104 S.Ct., at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very

often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, *see Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. **We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.**

*Id.* at 57-8 (emphasis added).

The trial court found, and we agree, that the State did not act in bad faith in releasing the Bentley. Therefore, we must determine whether the Bentley constituted materially exculpatory or only potentially useful evidence. *Trombetta* is instructive. It requires that "[t]o meet th[e] standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. In *Trombetta*, the Court considered drunk driving breath test samples (as opposed to the test results themselves) and found that neither condition of materiality was met. *Id.* As to exculpatory value, the Court considered the testing machine's well-established accuracy, which meant that "preserved breath samples would simply confirm the Intoxilyzer's determination that the defendant had a high level of blood-alcohol concentration at the time of the test. . . . [B]reath samples were much more likely to provide inculpatory than exculpatory evidence." *Id.* As to comparable evidence, the Court held that the respondents were not without alternative means of demonstrating their innocence. *Id.* at 490. The Court noted that they could address Intoxilyzer malfunction using the machine's weekly calibration results and by inspecting the machine. *Id.* Respondents could address the possible effect of external factors such as radio waves and operator error through cross-examination. *Id.* The Court therefore found that due process does not require law enforcement to

9

preserve breath samples, and therefore the Intoxilyzer results should not have been suppressed. *Id.* at 491.

In this case, the trial court held a full hearing on the issue of the exculpatory nature of the Bentley and concluded that it was merely potentially exculpatory. In doing so, it analyzed the evidence and the expert's opinions with regard to *Trombetta* and *Youngblood:*

> [Appellant's expert], by his own former testimony, has already formed an opinion of the malfunction and that his opinion on the state of the Bentley as the time of the crash is complete. The "mere possibility of helping the defense" by conducting even more testing on the Bentley which was already subjected to extensive testing by three different experts does not rise to the level of constitutional materiality . . . .

> Therefore, any additional evidence which the vehicle[] may have revealed only rises to the level of "potentially useful" evidence . . . .

As to the appropriate remedy, the court held:

> This Court's finding that the Bentley did not rise to the level of materially exculpatory evidence and instead was only potentially useful evidence renders dismissal too harsh a sanction in the absence of bad faith on the part of the State. The Court finds that since the State has conceded it will not call [the expert retained by Bentley] as an expert in the retrial, there remains no prejudice to Defendant in his ability to present the expert testimony and findings he has collected. . . . Furthermore, the Court notes that Defendant is not precluded from sharing with the jury the fact that the Bentley . . . [is] no longer available for inspection since [it was] prematurely released by the State.

Based on this, the court denied appellant's motion to dismiss.

Subsequently, during his second trial, appellant claimed that his brakes malfunctioned. His expert testified that there was a throttle malfunction that could have momentarily affected appellant's ability to brake and "may have contributed to the crash." The expert admitted that prior to the release of the Bentley, he had stated that further testing would not tell him anything beyond what he already knew based upon the car's diagnostic stored data, the ECMs.

On appeal, appellant essentially argues that had his expert been able to further examine the Bentley, he would have been able to complete additional testing that *might* have lent additional support to the expert's testimony that the brakes malfunctioned before the accident. However, the mere possibility that the testimony would have bolstered the expert's opinion does not rise to the level of "constitutional materiality." *Trombetta*, 467 U.S. at 488-89. An ECM readout indicating that the car was experiencing a throttle malfunction might have qualified as such, but experts on both sides had already tested the vehicle and obtained that readout. The fact that the car had a malfunction is not the evidence at issue. The expert could, and did, opine that a malfunction existed and that it affected braking. In contrast, the evidence sought to be obtained, if it existed, would have merely fleshed out and bolstered this opinion.

Further, like *Trombetta*, appellant had alternate sources available to elicit testimony to suggest that the throttle malfunctioned. The ECM report specified the malfunction, and his experts could (and did) testify as to some of the mechanics and timing of the malfunction. This also supports a finding that the Bentley was not materially exculpatory under *Trombetta*.

Finally, the State did not use its expert who performed the additional testing on the vehicle. Thus, appellant's expert was on the same footing as the State's expert concerning the vehicle.

This case is most similar to *State v. Patterson,* 199 So. 3d 253 (Fla. 2016). There, the defendant was charged with arson after a fire in his house and garage, which contained his truck. *Id.* at 254-55. After his insurance company paid him the proceeds of his policy on his truck, the insurer destroyed the truck. *Id.* The defendant was later arrested and charged with arson. *Id.* at 255. The State's expert was able to inspect the truck before it was destroyed. *Id.* The defendant's fire investigation expert had to rely on photographs of the burned truck (although he was able to inspect the house). *Id.* The defendant's expert was able to argue deficiencies in the State's expert's analysis, and he testified that there should have been examination of several electrical components, which the State had failed to eliminate as a an accidental cause of the fire. *Id.* at 256. The Florida Supreme Court held that the truck

> clearly is not material exculpatory evidence. The most that could be said is that, if the components that Patterson's expert identified as potential causes of the fire had been subjected to additional examination and testing, they might have supplied

11

> evidence to further support Patterson's theory that the fire
> was electrical and therefore accidental.

Id. at 257-58. The court then found no due process violation under *Youngblood.* *Id.* at 259

Similarly, in the present case, we agree with the trial court that the additional testing that was precluded by the release of the Bentley was merely potentially exculpatory.

Appellant contends, in the alternative, that the trial court should have given the jury an instruction on spoliation of evidence. However, the court offered to give a curative instruction if the defense proposed one, but the defense maintained that it could not propose one which would not impinge on the appellant's due process rights. Thus, appellant did not preserve this claim. Moreover, defense counsel extensively questioned its expert regarding the fact that he was not able to retest the vehicle after it was located in Texas and regarding what an inspection might reveal. No further request for an instruction was made. We thus find no abuse of discretion in failing to give an instruction on spoliation of evidence.

## Knowledge of Injury or Death Was Not an Element of the Failure to Render Aid Enhancement

Appellant argues that the court erred in instructing the jury that an element of the failure to render aid enhancement was that the defendant "knew or should have known that the accident resulted in injury or death." He argues that actual knowledge is required. The State counters that such knowledge is not required. As noted above, the record does not show that the jury was instructed at all on knowledge of the injury or death. Instead, the court instructed the jury that it must find that appellant "knew that the crash had occurred" (Count I) or "knew that an accident occurred" (Count II), and failed to give information or aid as required by law. Thus, the jury instructions neither tracked the standard instructions, both of which used "knew or should have known" standard, nor did it track the parties' proposed instructions, which added as an element whether the defendant knew or should have known that the accident resulted in an injury or death.

In this unusual circumstance, although it does not appear that appellant objected to the instructions as given, we nevertheless address whether the instructions were required to include a provision regarding knowledge of an injury or death. If this were an element of the crime, its exclusion would constitute fundamental error. We hold, however, that

knowledge of injury or death is not required for the failure to render aid enhancement to either DUI manslaughter or vehicular manslaughter.

Section 316.193(3), Florida Statutes (2010), provides for the penalty when a person who was driving under the influence fails to render aid:

Any person:

(a) Who is in violation of subsection (1) [Driving while Intoxicated];

(b) Who operates a vehicle; and

(c) Who, by reason of such operation, causes or contributes to causing . . . .

3. The death of any human being or unborn child commits DUI manslaughter, and commits . . . .

b. A felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, if:

(I) At the time of the crash, the person **knew, or should have known, that the crash occurred;** and

(II) The person failed to give information and render aid as required by s. 316.062.

(Emphasis added). Similarly, section 782.071(1), Florida Statutes (2010), provides for vehicular homicide penalties for a failure to render aid:

Vehicular homicide is:

.....

(b) A felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084, if:

1. At the time of the accident, the person **knew, or should have known, that the accident occurred;** and

2. The person failed to give information and render aid as required by s. 316.062.

13

> **This paragraph does not require that the person knew that the accident resulted in injury or death.**

(Emphasis added). Section 316.062(1), Florida Statutes (2010), as referenced in both statutes, sets forth when a person must give information and aid:

> The driver of any vehicle involved in a crash resulting in injury to or death of any person **or damage to any vehicle or other property** which is driven or attended by any person shall give his or her name, address, and the registration number of the vehicle he or she is driving, . . . and shall render to any person injured in the crash reasonable assistance[.]

(Emphasis added). Thus, to enhance the penalty for failing to render aid or give information, these statutes require knowledge only of the crash, not knowledge of any injury or death. As section 316.062(1), Florida Statutes, requires a person to stop and give information even for property damage, the occurrence of the crash itself, which would at least result in damage to property, would, by itself, require a person to stop and give information (and, if there is an injured person, give aid). There is no requirement that a person know of an injury or death, nor is there even a "should have known" element.[1]

The Florida Legislature enacts criminal laws and can specify the knowledge requirement for criminal acts. Our supreme court most recently addressed this legislative power in *State v. Adkins*, 96 So. 3d 412 (Fla. 2012):

> "Enacting laws—and especially criminal laws—is quintessentially a legislative function." *Fla. House of Representatives v. Crist*, 999 So. 2d 601, 615 (Fla. 2008). "[T]he Legislature generally has broad authority to determine any requirement for intent or knowledge in the definition of a crime." *State v. Giorgetti*, 868 So. 2d 512, 515 (Fla. 2004). We thus have recognized that generally "[i]t is within the power of the Legislature to declare an act a crime regardless of the intent or knowledge of the violation thereof." *Coleman v. State ex rel. Jackson*, 140 Fla. 772, 193 So. 84, 86 (1939). "The doing of the act inhibited by the statute makes the crime[,] and moral turpitude or purity of motive and the knowledge or

---

[1] However, the failure to render aid enhancements under the DUI manslaughter and vehicular homicide statutes by definition only apply where a death occurs.

ignorance of its criminal character are immaterial circumstances on the question of guilt." *Id.*

Given the broad authority of the legislative branch to define the elements of crimes, the requirements of due process ordinarily do not preclude the creation of offenses which lack a guilty knowledge element.

*Id.* at 417.

In a limited number of situations, "the omission of a mens rea element from the definition of a criminal offense has been held to violate due process." *Id.* at 419. For instance, *Adkins* looked to *Lambert v. California*, 355 U.S. 225 (1957), involving a Los Angeles code provision requiring felons to register within five days of entering the city. *Adkins*, 96 So. 3d at 419. In *Lambert*, the Supreme Court held it to be a violation of due process when applied to a person who had no knowledge of a duty to register. 355 U.S. at 228. The Supreme Court explained that such innocent *passive* conduct could not be penalized unless the defendant had actual knowledge of the requirement. *Id.* Nevertheless, the Supreme Court noted the narrowness of its ruling:

> *There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition.* But we deal here with conduct that is wholly passive—mere failure to register. It is unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed. The rule that "ignorance of the law will not excuse" is deep in our law, as is the principle that of all the powers of local government, the police power is "one of the least limitable."

*Id.* (emphasis supplied; citations omitted). Our supreme court followed *Lambert* in *Giorgetti* and held that a failure to register as a sex offender required a mens rea component, invalidating statutes which excluded knowledge of the duty to register as an element of the crime. *Giorgetti*, 868 So. 2d at 517.

*Adkins* also noted that the lack of a scienter requirement violated due process "if a criminal statute's means is not rationally related to its purposes and, as a result, it criminalizes innocuous conduct." *Adkins*, 96 So. 3d at 420 (quoting *Schmitt v. State*, 590 So. 2d 404, 413 (Fla. 1991) (holding that a statute which criminalized possession of photos depicting

a child's clothed or unclothed genitals would have criminalized entirely innocent conduct such as family photos)).

In sections 316.193 and 782.071, Florida Statutes, the Legislature did not omit a scienter requirement; it specifically provided that a person who drove under the influence and was involved in a crash must have either known or should have known of the crash to receive the enhancement. The Legislature did not require any knowledge of death. It is the Legislature's prerogative to establish the scienter requirement.

The limited categories of statutes in which courts have required a knowledge requirement to satisfy due process are not applicable here. Unlike *Lambert*, where the prohibited conduct was "wholly passive," here, a person must actively fail to render aid by leaving the scene of the crash. *Lambert*, 355 U.S. at 228. And clearly, failing to render aid or give information is not "innocent conduct," but is most definitely rationally related to the Legislative purpose. *Adkins*, 96 So. 3d at 420 (quoting *Giorgetti*, 868 So. 2d at 517). "One of the main purposes of the statute is to ensure that accident victims receive medical assistance as soon as possible." *State v. Dumas*, 700 So. 2d 1223, 1225 (Fla. 1997). A person should stop, if he or she knows that she has been involved in a crash, for no other reason than to ascertain whether any injury or damage has occurred. To require a person involved in an accident to know of an injury before he or she is required to stop would frustrate the very purpose of sections 316.193 and 782.071, Florida Statutes. There is no due process violation in the statutes' failure to include a requirement that a defendant knew (or should have known) of an injury or death before being required to stop and render aid.

Appellant relies on a series of cases that have required a knowledge of injury element under Florida's hit-and-run statute, section 316.027, Florida Statutes (2010). We, however, conclude that the statutes are sufficiently different that these cases do not apply here.

Section 316.027(2), Florida Statues, provides that a driver involved in a crash resulting in injury or death must immediately stop and remain at the scene and comply with the duties in section 316.062, Florida Statutes. A person who *willfully* violates this requirement commits a felony varying degree, depending on the resulting injury or death. § 316.027(2)(a)-(c), Fla. Stat. There is no specific scienter requirement. In contrast, both sections 316.193 and 782.071, Florida Statutes, have specific knowledge elements, requiring that the person committing DUI manslaughter or vehicular homicide knew or should have known of the crash. In fact, the

Legislature specifically excluded knowledge of injury or death as an element in section 782.071(1), Florida Statutes.

As it is within the Legislative prerogative to dispense with such a requirement, *see Adkins*, 96 So. 3d at 417, it is not our function to rewrite the statute to require knowledge of death as an element of the crime. Although section 316.193(3)(c), Florida Statutes, does not have specific language eliminating knowledge of injury or death as an element, it only requires a failure to comply the duties in section 316.062, Florida Statutes, which apply even for damage to property. Knowledge of a vehicular crash would signify at least some damage to property, regardless of whether death occurred.

In *State v. Mancuso*, 652 So. 2d 370 (Fla. 1995), the Florida Supreme Court held that the hit-and-run statute requires that the defendant either knew or should have known of the resulting injury or death. *Id.* at 372. The court based its decision on the weight of the majority of jurisdictions with similarly worded statutes which required actual or constructive knowledge of injury in order to find criminal liability under hit and run statutes. *Id.* Those similarly-worded statutes did not include a knowledge element. Where, however, a knowledge element has been included in hit-and-run statutes, courts have construed the statutes in accordance with their terms. For instance, where the statute provided "[e]ach person operating a motor vehicle who is knowingly involved in an accident which causes . . . injury or damage to property shall at once stop[,]" the state was required to prove only knowledge of the accident and not the injury. *See State v. Johnson*, 630 A.2d 1059, 1063 (Conn. 1983); *see also N. Olmsted v. Gallagher*, 2 Ohio App. 3d 414, 416, 442 N.E.2d 470 (8th Dist.1981); *State v. Sabetta*, 672 A.2d 451, 452-53 (R.I. 1996). Similarly, as sections 316.193(3)(c) and 782.071(1), Florida Statutes, both have knowledge requirements, cases, such as *Mancuso*, involving statutes with no knowledge requirement, are not dispositive of this issue.[2]

In sum, we hold that under the DUI manslaughter and vehicular homicide statutes, the enhancements for failure to render aid and provide information require that the person knew or should have known of the crash or accident, but do not require the State to prove that the defendant

---

[2] This distinction is further underlined by the legislative history of section 782.071, Florida Statutes. The specification that knowledge of injury or death is not required was initially added in the 1996 session, shortly after *Mancuso* was decided. *See* 1996 Fla. Sess. Law Serv. Ch. 96-330 (West). Section 316.193, Florida Statutes, which does not contain a similar provision, was initially enacted in 1999.

knew or should have known of the death or injury of the victim. To require such proof would defeat the purpose as noted in *Dumas:*

> This result-driven sanction implicitly recognizes the possibility that a fleeing driver's failure to stop and render aid may be the reason that an injured person dies. Moreover, requiring proof that a driver had knowledge of death would lead to an absurd result: a driver who callously leaves the scene of a serious accident can avoid a [first]-degree felony conviction by disavowing knowledge of death.

*Dumas,* 700 So. 2d at 1226. Additionally, to the extent that the jury instruction, as given, deviated from the standard instruction in stating that appellant had to "know" that the accident occurred, the instruction was erroneous. But as the state was held to a higher level of proof, there is no error. Moreover, there is no dispute in the record that appellant clearly knew that he had just hit a vehicle and was in a "bad" accident. Thus, the knowledge of the accident component was uncontested at trial. No reversible error occurred.

### The Blood Draw Was Not an Unlawful Search and Seizure, Based on Exigent Circumstances

Appellant argues that the blood draw obtained from him in the early morning hours after the accident was made without a warrant and violated the Fourth Amendment prohibition against unreasonable searches and seizures. The State counters that exigent circumstances permitted the warrantless blood draw. We agree with the State.

Warrantless searches are "per se" unreasonable unless they fall within a recognized exception to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357 (1967). A blood draw conducted under police direction is considered a search and seizure under the Fourth Amendment. *Schmerber v. California,* 384 U.S. 757, 767 (1966). However, an exception to the warrant requirement exists "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely,* 133 S.Ct. 1552, 1558 (2013) (quoting *Kentucky v. King,* 563 U.S. 452, 460 (2011)).

> A variety of circumstances may give rise to an exigency sufficient to justify a warrantless search . . . . As is relevant here, we have also recognized that in some circumstances law enforcement officers may conduct a search without a warrant

to prevent the imminent destruction of evidence. While these contexts do not necessarily involve equivalent dangers, in each a warrantless search is potentially reasonable because "there is compelling need for official action and no time to secure a warrant."

*Id.* at 1558-59 (citations omitted) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509-10 (1978)). Thus, "[t]o determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances." *Id.* at 1559.

In *McNeely*, the defendant was stopped for speeding, declined a breath test, and was taken to a nearby hospital for blood testing. *Id.* at 1556-57. The defendant did not consent, and the officer never attempted to secure a warrant. *Id.* at 1557. The United States Supreme Court held that the officer violated the Fourth Amendment, as the test was a routine intoxicated driver case where no factors, apart from the natural dissipation of blood alcohol, suggested an emergency. *Id.* at 1568. The Court held that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *Id.* However, "the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence" are relevant in determining whether a warrantless search is reasonable. *Id.*

*McNeely* discussed *Schmerber v. California*, 384 U.S. 757 (1966), as fitting within the type of cases in which exigent circumstances would allow a warrantless search. *McNeely*, 133 S.Ct. at 1559-60. In *Schmerber*, a driver who had suffered injuries in a car crash was taken to the hospital. *Schmerber*, 384 U.S. at 758. While at the hospital receiving treatment, police arrested him for driving while under the influence and, over his objection, ordered a blood test. *Id.* at 758-59. The Court held that the warrantless blood test was permissible because the police "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Id.* at 770 (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)). In addition to the natural dissipation of blood alcohol, "time had to be taken to bring the accused to a hospital and to investigate the scene of the accident," and thus "there was no time to seek out a magistrate and secure a warrant." *Id.* at 770-71.

In this case, the court found that, based upon the timeline, exigent circumstances were present. Appellant absented himself from the scene

for over an hour and then returned but went to the hospital for treatment of his own injuries before the investigators found the vehicle and body. By the time the homicide investigator arrived and then went to the hospital, nearly four hours had passed since the time of the crash, but less than two hours from the time the body was discovered. The investigator testified that it would have taken an additional two hours to obtain a search warrant. Although a local police officer testified on behalf of appellant that it would not have taken much time to get a warrant, it was for the trial court to judge the credibility of the witnesses.

This was not a "routine DUI" once the victim's body was discovered. Although the Supreme Court noted that "the natural dissipation of alcohol in the bloodstream does not constitute an exigency in *every* case" *McNeely*, 133 S.Ct. at 1554 (emphasis added), the Court clearly signaled that in some cases the destruction of evidence by the natural dissipation of alcohol could constitute an exigent circumstance. If the circumstances in *Schmerber* constituted exigent circumstances to justify a warrantless blood draw, then the circumstances of this case present a far more compelling reason to obtain a blood draw as soon as possible so as to prevent the dissipation of alcohol in appellant's system. We thus find no Fourth Amendment violation. The court correctly denied the motion to suppress.

As to the remaining issues, we affirm without further discussion. We note, however, that appellant challenges the admission of his blood draw results on the basis that FDLE rules are insufficient to ensure scientific reliability. We decided this issue adverse to appellant's position in a prior appeal. *Goodman v. Fla. Dep't of Law Enf't*, 203 So. 3d 909, 912 (Fla. 4th DCA 2016). We certified a question to the Florida Supreme Court, which has taken jurisdiction. *Goodman v. Fla. Dep't of Law Enf't*, 41 Fla. L. Weekly D1247b (Fla. Oct. 14, 2016). We therefore do not address this issue in this appeal.

## Sentencing

Finally, appellant contends that double jeopardy precludes his conviction for both DUI manslaughter with failure to render aid and vehicular homicide with failure to render aid. Although the court withheld adjudication on the vehicular homicide charge, we have held that the withholding of adjudication on an offense constitutes a "conviction" for double jeopardy purposes. *Griffin v. State*, 69 So. 3d 344, 346 (Fla. 4th DCA 2011) (adopting the reasoning of *Bolding v. State,* 28 So. 3d 956, 957 (Fla. 1st DCA 2010)). A conviction for DUI manslaughter and for vehicular homicide involving a single victim violates double jeopardy. *See Ivey v.*

*State,* 47 So. 3d 908 (Fla. 3d DCA 2010). Therefore, we direct that the trial court vacate the conviction for vehicular homicide on remand.[3]

For the foregoing reasons, we affirm appellant's conviction and sentence for DUI manslaughter with failure to render aid but remand to vacate his conviction for vehicular homicide.

TAYLOR and LEVINE, JJ., concur.

*    *    *

***Not final until disposition of timely filed motion for rehearing.***

---

[3] We recognize that the trial court withheld adjudication and sentencing on vehicular homicide at the State's request to hold it in abeyance pending the results of the appeal of appellant's conviction and sentence on DUI manslaughter. We recognize the dilemma both the court and the State face in such a circumstance. Resolving a double jeopardy issue on appeal where there are substantial issues as to the other conviction may be a reasonable solution.